IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL WATCHULONIS,

Plaintiff,

v.

CITY OF ATLANTA,

OFFICER JEFF CANTIN,
in his individual capacity,

OFFICER CARLOS THOMAS,
in his individual capacity,

OFFICER JACK BENTLEY,
in his individual capacity,
and
OFFICER MIKE DOE,
in his individual capacity (complete
name not yet known)

Defendants.

CIVIL CASE NO.:
1:23-CV-02204-TCB

## AMENDED VERIFIED COMPLAINT

COMES NOW Michael Watchulonis, a Plaintiff in the above styled action

and files this his Complaint for injunctive relief and damages.

This is a civil rights action under 42 U.S.C. § 1983, the First, Fourth and Fourteenth Amendments to the United States Constitution and Georgia law. Michael Watchulonis ("the Plaintiff") alleges that he was confronted by Defendant-law enforcement officers who (1) interfered with his filming in violation of the First Amendment and (2) later illegally and unconstitutionally detained, intimidated, harassed and threatened him.  Officers even demanded to review his footage, and delete any video footage they decided that they did not want the public to see.  Plaintiff alleges both that interference with filming prior to detention was in violation of the First Amendment, and later unlawful and unreasonable detention (with freedom from arrest premised on allowing officers to delete images) was in retaliation for the exercise of his First Amendment rights, even if there was arguable probable cause or probable cause for some minor crime under the Fourth Amendment.

The City of Atlanta has a policy and practice of interfering with and often pre-textually arresting citizens and journalists for filming police activities.  This policy and custom is demonstrated by repeated filming arrests, settlements in

2

litigation around those filming arrests, court mandated policy and training reforms regarding filmers' rights, contempt findings related to failure to implement those reforms, and recent statements from the highest level of the Atlanta Police Department endorsing pretextual arrests for filming.

**PARTIES**

1.

Plaintiff Michael Watchulonis is a resident of the State of Georgia, United States citizen, and over the age of eighteen. Watchulonis is a journalist and documentary filmmaker who has produced more than two dozen factual films interviewing subjects and capturing events around the world. As a producer for Atlanta's WTBS Public Affairs department, he covered events and people in Metro Atlanta, receiving 29 regional Emmy Awards for documentary, Public Affairs, News & Information, and Magazine programming. He also served as the Executive Producer for GameTap News.

2.

Defendant City of Atlanta is a municipality whose policies and practices were a moving force in constitutional violations here. The City can be served at:

55 Trinity Ave. SW, Atlanta GA 30303. At all times relevant to this lawsuit, Defendant City of Atlanta acted under the color of law.

3.

Defendant Jeff Cantin is a Major employed by the City of Atlanta Police Department. The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Defendant Jeff Cantin may be served at this address. At all times relevant to this lawsuit, Defendant Jeff Cantin acted under the color of law. Defendant Jeff Cantin is sued in his individual capacity.

4.

Defendant Carlos Thomas is an Officer employed by the City of Atlanta Police Department. The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Defendant Carlos Thomas may be served at this address. At all times relevant to this lawsuit, Defendant Carlos Thomas acted under the color of law. Defendant Carlos Thomas is sued in his individual capacity.

4

5.

Defendant Jack Bentley is a Sergeant employed by the City of Atlanta Police Department. The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Defendant Jack Bentley may be served at this address. At all times relevant to this lawsuit, Defendant Jack Bentley acted under the color of law. Defendant Jack Bentley is sued in his individual capacity.

6.

Defendant Mike Doe is an Officer by the name of "Mike" who joined Defendant Jeff Cantin in interrogating, intimidating, harassing, and detaining Plaintiff Watchulonis. It is believed that Defendant Doe may be employed by the City of Atlanta Police Department or Georgia Bureau of Investigation. Defendant Doe will be served once his identity becomes fully known. At all times relevant to this lawsuit, Defendant Doe acted under the color of law. Defendant Doe is sued in his individual capacity. Defendant Mike Doe will hereinafter be referred to as "Defendant Mike."

7.

All defendants reside in the Northern District of Georgia.

## JURISDICTION AND VENUE

8.

This case presents a federal question under the First, Fourth and Fourteenth Amendments, and this Court has subject matter jurisdiction under 28 U.S.C. § 1331.  Under 28 U.S.C. §§ 1331 and 1343(a)(3)&(4), the Court can entertain an action to redress a deprivation of rights guaranteed by the United States Constitution, and the Court has jurisdiction under 28 U.S.C. § 1367 to hear an action to redress a deprivation of rights guaranteed by the laws and the Constitution of the State of Georgia.

9.

This Court has personal jurisdiction of the Defendants under 28 U.S.C. § 1367 and GA. CONST., art. I, § 1, ¶¶ V, XIII.

10.

Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this

judicial district and Defendants reside within this district.

11.

All of the parties herein are subject to the jurisdiction of this Court.

12.

Attorney's fees and costs are authorized under 42 U.S.C. § 1988.

## FACTUAL ALLEGATIONS

### 13.

On June 15, 2022, shortly before 10am Mr. Watchulonis parked his car in the Intrenchment Creek Trailhead parking lot – a public parking lot. There were no signs limiting access to the area that is historically freely used by members of the public.  After exiting his car, Mr. Watchulonis donned his plate carrier that was clearly marked with a "PRESS" badge on the front and back. His purpose in arriving at the Intrenchment Creek Park was to work on a story surrounding the Intrenchment Creek Park, land swap, and proposed Atlanta police training facility controversies.

### 14.

Mr. Watchulonis was walking along the public walking, hiking and biking trails of Intrenchment Creek Park for approximately 45 minutes.  Mr. Watchulonis observed no signage stating that the area where he was walking was not open to the public or was otherwise restricted. Mr. Watchulonis did not veer off the trails.

15.

At approximately 10:45a.m., Mr. Watchulonis noticed two four-wheel ATV's and began filming them. He assumed these vehicles might be law enforcement vehicles, and stayed at least a hundred yards away, not wanting to interfere with police operations or give them a reason to interact with him. He filmed from that distance, and then began backing away down the trail. He began recording on his Canon camera when he heard the police ATVs approaching him from the rear.

16.

At approximately 10:57a.m., Mr. Watchulonis was approached by two police officers on an ATV who began to interfere with his newsgathering. Defendant Carlos Thomas stated that Mr. Watchulonis "cannot be in there," and stated that Mr. Watchulonis was trespassing.  The officer did not (1) identify what parts of the historically open area where Mr. Watchulonis was walking were now not open to the public, (2) did not indicate that he had authority to speak for the owner of the property, or (3) provide a route or (4) time to comply with the officer's desire that he move to some unknown other location.

Defendant Thomas stated at the time that Mr. Watchulonis was not being detained – but nevertheless stated that he would be escorted out of the area because he was allegedly trespassing. Defendant Thomas ultimately ordered Mr. Watchulonis to walk in a direction of a "gate." Mr. Watchulonis was forced to cease his intended newsgathering in order to peacefully and fully comply with the order, but also explained that this path was not where he came into the area and parked.  Mr. Watchulonis was no longer permitted to engage in his intended newsgathering activities, may or may not have been seized at this point, though he reasonably believed he was being seized and not free to leave based upon the officer's tone and orders.

17.

Approximately seven minutes into the encounter several more officers arrived on additional ATV's. One of those officers – Defendant Jack Bentley approached Mr. Watchulonis, informed him that he was being detained, and that the officers would escort him out.  At this time, Mr. Watchulonis was in the process of following and complying with the orders of the Officer Thomas to disperse the undefine prohibited area and was not being permitted to film the

encounter.

18.

Mr. Watchulonis was then ordered into an ATV and driven some distance away where – approximately eleven minutes into the encounter – he was addressed by Defendant Jeff Cantin. At that point Defendant Cantin informed Mr. Watchulonis that he was under arrest for criminal trespassing.

19.

During the initial encounters with Defendant Thomas, Defendant Bentley, and Defendant Cantin, Mr. Watchulonis repeatedly and consistently explained to all officers involved that (1) he was a journalist, (2) he parked his vehicle in a public parking lot of the Intrenchment Creek Park, (3) he followed the public trails while walking through the forest, (4) he never encountered any sign or barrier indicating that he was no longer on public property, and that – (5) if by some chance he was unknowingly trespassing – he was happy to leave whatever area the officers were claiming he was not supposed to travel through if they directed him to a path to do so and gave him an opportunity to do so. Mr. Watchulonis repeated these statements several times throughout the duration of

his detention to each of the defendants.

20.

Though his newsgathering was being interfered with by Defendants, Mr. Watchulonis was fully compliant with all officers' instructions and orders at all times during his interaction with defendants and throughout his detention.

21.

Upon informing Defendant Cantin of where he parked his car, Mr. Watchulonis was told by Defendant Cantin that "Anybody that parks in that park is one of your little forest people," referring to individuals that oppose the land swap and construction of Atlanta police training center. "Land Swap" is a term that refers to a land swap between DeKalb County and Blackhall Studios involving 40 acres of the Intrenchment Creek Park and is currently subject of a pending lawsuit and intense public debate. (See for example https://www.stoptheswap.org for more information.)

22.

Approximately one hour and fourteen minutes into his detention Mr. Watchulonis was informed by Defendant Cantin that Defendant Mike (identified

herein as Mike Doe) was going to come over and talk to Mr. Watchulonis.

Defendant Mike Doe arrived about a minute later, wearing plain clothes and

carrying a notepad.  On information and belief, Mike Doe is also a police officer

for the City of Atlanta.

23.

Defendant Mike Doe asked Mr. Watchulonis if he would be willing to talk

to him about his involvement or association with Defend the Forest issue.

24.

Shortly thereafter, and while seized and threatened with arrest, Defendant

Mike Doe stated: "I am going to ask you to delete all the footage that you have

today since it has been obtained illegally to begin with – and depending on how

the rest of this interview goes will determine whether or not you are going to be

arrested … if you are cooperative with us … I mean again … I think this is a

story where I think you want to have access to both sides."

25.

Defendant Mike Doe then asked Mr. Watchulonis: "Would you be willing

to delete the footage obtained today?" Mr. Watchulonis responded: "Guys – I'm

13

a journalist! Delete my footage?" Defendant Mike Doe replied: "Delete the

footage from today – that's right." Mr. Watchulonis responded: "I can't delete

footage guys!"

26.

Defendant Mike Doe then threatened Mr. Watchulonis stating that

Defendant Cantin would arrest Mr. Watchulonis and seize his camera if he failed

to comply with orders to show images to law enforcement and delete the footage

of his reportorial investigation on the command of Defendant officers.

27.

After some further verbal exchange Defendant Mike Doe stated: "We're

trying to work with you. I mean – it's up to you!"

28.

When Mr. Watchulonis reiterated that he would not delete images or show

the officers his footage, Defendant Mike Doe stated: "Let's go ahead and seize

it!"

29.

Some time later Defendant Mike Doe said to Defendant Cantin: "Major – if

you are okay … let's issue [Mr. Watchulonis] a citation … give him back his gear…"

30.

Defendant Mike Doe added: "I'm sure our paths will cross again down the road!"

31.

Ultimately Mr. Watchulonis was released without being issued a citation after a detention that lasted approximately one and a half hours, and which included threats of arrest, intimidation, harassment, and demands that Mr. Watchulonis show and delete his footage on command of the Defendant officers.

32.

Before being allowed to leave, Defendant Mike ordered Mr. Watchulonis to let Defendant Mike take his picture. Mr. Watchulonis was forced to comply with this order. In connection with taking Mr. Watchulonis' picture, Defendant Cantin stated that they document everyone who goes into the forest.

33.

All defendants had actual knowledge that Mr. Watchulonis was not

criminally trespassing and had no probable cause or arguable probable cause for any offense.

34.

All Atlanta police officers are specifically trained that it is illegal and a violation of APD SOP 2011 (see *infra*) for them to seize a reporter, interfere with filming, and demand and threaten a citizen into showing and deleting his footage. Defendants knew that Mr. Watchulonis was a journalist and Defendant Mike Doe openly acknowledged that fact at least twice.

35.

Mr. Watchulonis was interfered with in his filming and later detained solely because he was seen filming and/or because (as the officers opined without basis) he supported the views of the "little forest people" – a reference to individuals that hold a political opinion in opposition to the land swap and construction of the police training facility.

36.

Mr. Watchulonis was detained even though there was no arguable probable cause, probable cause or any ground to believe he was engaged in any

criminal activity. Mr. Watchulonis parked in a public parking lot, was on a

public trail, and there was no signage to the contrary.  When an officer claimed

that he was trespassing, he complied with the officers' demands to disperse and

followed the officers' directions in doing so.

37.

Mr. Watchulonis would not have had his newsgathering interfered with or

later ultimately been seized and detained for a period of time of one and a half

hours but for his filming and/or the assumption of Defendants that he supported

viewpoints supportive of the Defend the Forest protesters and contrary to those

of the officers regarding the construction of a police training facility.

38.

The City of Atlanta Police Department Standard Operating Procedure

APD.SOP.2011 specifically Section 4.1.1 provides:

> All employees shall be prohibited from interfering with a citizen's
> right to record police activity by photographic, video, or audio
> means.  This prohibition is in effect as long as the recording by the
> citizen does not physically interfere with the performance of the
> officer's duties. (Attached hereto as Exhibit A).

The City of Atlanta Police Department Standard Operating Procedure

17

APD.SOP.2011 specifically Section 4.1.2 provides:

> All employees shall be prohibited from intentionally deleting or destroying the original or sole copy of any photograph, audio, or video recording of police activity created by a member of the public.

39.

Under prior court federal orders regarding filming referenced in The City of Atlanta Police Department Standard Operating Procedure APD.SOP.2011, officers are required to attend training on these requirements.

40.

Each of the Defendants had specific subjective and objective knowledge of the unconstitutionality of their interference with filming, and their unconstitutional demand to delete images.

### City of Atlanta's Custom, Complete Lack of Monitoring and Contempt of Court in Failing to Adopt Court Required Policies and Training Regarding Rights of Citizens and Journalists to Film Police Activity

41.

The City of Atlanta, as a matter of policy and practice, has routinely and customarily interfered with and often arrested citizens solely for constitutionally protected filming or photographing of police activity.

18

42.

At least six prior legal matters have been settled by the City of Atlanta involving officers who interfered with/arrested citizens for constitutionally protected filming or photographing of police activity. Several other instances, some leading to litigation, have occurred where officers interfered with/ arrested citizens for constitutionally protected filming or photographing of police activity.

43.

In each of these instances (1) the citizen or journalist was filming at the moment of their arrest/interference with filming, (2) the officer(s) interference/arrest stopped further filming from taking place, (3) the arrest/interference never led to actual criminal prosecution because charges were dropped (if charges were brought at all) after the event being filmed had been stopped. Several, as here, involved demands to stop filming while others involved the officer interfering immediately with the filming taking place.

Anderson Lawsuit

44.

In *Anderson v. City of Atlanta*, No. 11-CV-33980SCJ (N.D.Ga. 2011), Plaintiff Felicia Anderson, brought her case against the City of Atlanta and one of its police officers alleging, among other things, that she was falsely arrested for photographing police activity that occurred in public and that this arrest was conducted pursuant to an unlawful policy and practice of the Atlanta Police Department ("APD").

45.

Anderson was at her home in Atlanta.  She went outside when she heard people shouting and yelling.  Anderson saw several police vehicles parked on the street.  She also observed officers with a battering ram.  Several of Anderson's neighbors had also come outside in response to the police activity.

46.

Anderson crossed the street from her home and continued to observe the police investigation unfold.  As Anderson crossed the street she saw several police officers repeatedly kick a male civilian while he was lying on the ground,

handcuffed.  Several of Anderson's neighbors also witnessed this brutal assault.

47.

Anderson returned to her home and came back outside with her camera.  She witnessed the same officers whom she had previously seen assaulting and kicking the male civilian on the ground.  Anderson began to document the situation with her camera while standing on a public sidewalk at the opposite side of the street from where the assault was taking place.  At this point, the officers were dragging the subject on the ground but stopped when they saw Anderson.

48.

While she was filming the assault, several of the officers who were participating shouted at Anderson and demanded that she stop photographing them. The officers gave no reasons for their demands and threatened Ms. Anderson with arrest if she did not stop.

49.

With Anderson still standing on the sidewalk, an APD officer approached Anderson and demanded that she give him her cell phone.  Anderson refused and responded that the officer had no authority to take her cell phone from her.  The

officer made the demand a second time.  Plaintiff still refused.  The officer then forcibly grabbed at Anderson's cell phone from her hand.

50.

Anderson started to walk back to her home while still on the public sidewalk, and the officer followed her.  Anderson became flustered and she dropped her camera on the ground, at which time the officer seized it.

51.

The officer ordered Anderson off the sidewalk and into the middle of the street.  He demanded Anderson's identification, and she produced it, providing Branum with an official identification card issued by the State of Michigan, her prior state of residence.

52.

Anderson asked for her camera back but the officer refused.  Two officers then began to visibly manipulate Anderson's camera.  One boasted that he had deleted the close-up photos that she had taken, leaving the ones where, in the officer's words, "you can't see shit."  Several of Anderson's neighbors witnessed the officer delete the photos from Anderson's camera.

53.

The officer stated to Anderson that he "didn't like her attitude" and that he would "take her on a trip downtown."  Several officers continued to hurl obscenities at Anderson.

54.

The officer who had seized the camera then handcuffed Plaintiff, placed her under arrest citing the following offenses:  (a) no driver's license, under O.C.G.A. § 40-5-20; (b) pedestrian walking in roadway, under O.C.G.A. § 40-6-96; and (c) disorderly conduct, under section 106-81.7 of Atlanta's Code of Ordinances.

55.

At no time during the incident at issue was Anderson driving a motor vehicle as that term is defined under Georgia statutory law.  In fact, Ms. Anderson did not know how to drive; she owned a motorized scooter.

56.

At no time during the incident at issue did Anderson physically obstruct any APD officer in their "lawful occupation" under the disorderly conduct ordinance at issue.  Moreover, there is nothing "lawful" about officers physically assaulting and

battering a restrained individual under color of law.

57.

At all times during the incident at issue, Ms. Anderson exercised her constitutional right to peaceably observe and record police activity while situated on a public sidewalk at a distance from the officers. The first time she entered a roadway or street was when she was directed to do so by an APD officer.

58.

Anderson's criminal charges were swiftly dismissed, and she filed a federal lawsuit. (Anderson's Complaint is Attached hereto as Exhibit B)

59.

The parties ultimately reached a settlement on Ms. Anderson's claims that included a Consent Order requiring the City to: (A) add specific language to the Atlanta Police Department's Standard Operating Procedure ("SOP") prohibiting officers from deleting or destroying recordings of police activity; (B) upgrade the penalty for officers who interfere with the public's right to record, or who delete or destroy these recordings, to a dismissal category offense; and (C) train officers every two years regarding these new changes to the SOP. The court-ordered

language prohibiting officers from deleting or destroying recordings was never added to the Atlanta Police Department SOP, and the required training regarding these collective revisions was not timely entered and conducted and neither the policy nor the training were in place at the time of this incident despite existing court orders.  The Order required the City of Atlanta to "permanently … implement" specific revisions to the APD SOP and "to conduct mandatory in-person training of all Atlanta police officers every two years regarding these SOP revisions."

60.

More than two years later, in deliberate indifference to both the existing Consent Order and to the obvious need for the policy and training outlined, the City still had not complied with the straightforward obligations imposed upon it by the Order.  The City was held in contempt.  (Contempt Order Attached hereto as Exhibit C.)

<u>Ruch Lawsuit</u>

61.

In November 2014, several individuals covering the Ferguson demonstrations in downtown Atlanta had their cameras taken away from them by APD officers as these individuals attempted to film police activity. One of them was Tyson Paul, a photojournalist for 11AliveNews, whose arrest by police officers during his coverage of the protests has been the subject of numerous news stories. Another was John Ruch, a freelance journalist for *Creative Loafing*, whose arrest by police officers during his coverage and constitutional rights being violated resulted in litigation. See *Ruch v. City of Atlanta*, No. 1:15-cv-03296-MHC (N.D. Ga. 2015).

62.

John Ruch is a frequently published freelance journalist. On November 25, 2014, he went to downtown Atlanta to investigate a potential news story: the Ferguson protest taking place in downtown Atlanta. Ruch was assigned by *Creative Loafing* News Editor Thomas Wheatley to cover the protest along with his on-scene reporter, Max Blau. Wheatley assigned Ruch to cover the tail-end of

the march, while he took the front end and Max Blau covered the middle of the group. Ruch's work would involve tweeting on *Creative Loafing*'s live blog and contributing whatever stories or photographs he had for future stories in the *Creative Loafing*.

63.

Around 11:45 p.m., the march turned onto Spring Street and began to coalesce around a specific group of protesters. The road was closed by police to vehicular traffic.  Recognizing that a newsworthy matter was transpiring, Ruch approached the scene to photograph and report on whatever was occurring. When he reached the main body of protesters on the sidewalk, they had formed a kind of circle around something and were chanting. Through gaps in the human wall, he could see police wrestling one or two people to the ground and arresting them.

64.

From his vantage point on the sidewalk some distance away, Ruch had a clear view of police officers wrestling a person to the ground and arresting them. The people being arrested were screaming and the police officers were very

forcefully slamming them to the ground. While Ruch did not know the reason for the arrest, he knew it would be a powerful image in any case.

65.

Ruch lifted his phone to take a news photo, keeping distance and placement on the sidewalk while attempting to frame the shot. His head was down and focused on his camera phone, which he held around stomach height to photograph the action on the ground.

66.

Without warning of any kind, someone (later identified as an APD officer) waved a hand in front of his camera purposefully disrupting him. This person did not say anything, and only attempted to block Ruch's shot.

67.

Still in possession of his camera, Ruch remained on the sidewalk and away from the arrest.  He shifted his body slightly in order to get the shot while the gap between other people was still clear. The hand-waving person (APD officer) then leaped in front of Ruch.  The officer then grabbed Ruch's camera and his wrist or forearm, preventing him from taking the shot.   Ruch then looked at the

person fully and saw she was a police officer.  The officer continued to say

nothing as she grabbed Ruch. She then pushed Ruch, forcing him to take a step

back.

68.

Ruch immediately said, "Hey, I'm a reporter! I'm with the media! I'm with

the media!" The officer still said nothing but paused for a half-second. Ruch then

felt someone grab and tug on his jacket from behind.

69.

Ruch was arrested for disorderly conduct and the officer demanded that

he put his phone away.  As Ruch lay on the ground,he repeatedly said he was a

reporter for *Creative Loafing* and repeatedly asked why he was being arrested and

what he was being charged with. The officers said nothing.

70.

As this was happening, Editor Wheatley walked nearby. Ruch shouted to

him, "Thomas, they're arresting me!" Wheatley approached, identified himself as

the *Creative Loafing* News Editor, and informed the officers that he was a

journalist working for *Creative Loafing*.

29

71.

The officers asked if Ruch had a "media badge." Wheatley explained to the

officers that Ruch was not issued a media badge and noted that he himself did

not have any such badge. The officers said nothing, merely standing there

holding Ruch's arms. Thomas Wheatley and Ruch repeatedly asked the officers

why they were arresting Ruch and under what charges. The officers remained

silent.

72.

As Ruch was being taken to a police transport bus, Wheatley pointed Ruch

out to Greg Bluestein, a reporter with the *Atlanta Journal-Constitution*. Ruch

quickly told Bluestein his name and that he was being arrested for taking a news

photo.

73.

As they walked with Ruch, Wheatley followed alongside, repeatedly

asking the officers what Ruch was charged with. One officer repeatedly said,

"We can't tell you. That would violate his privacy." Ruch stated he waived any

privacy rights and that Ruch too did not know the charge. The officer still did not

say what the charges were.

74.

The police made Ruch stand in a group with the other arrestees, away

from reporters.  One citizen holding some type of camera approached, and an

officer remarked to another that he had been told to stay away and that he would

be arrested if he approached closer and filmed.

75.

Eventually, a new officer approached Ruch and engaged him.  An officer

spoke with Ruch and asked if Ruch held a Georgia driver's license, and Ruch

said yes. That officer attempted to intimidate Ruch, standing very close, face to

face, and said something approximating, "Look, you must have done something

to get arrested." Ruch replied, "I did not commit any crime," explained that he

was a reporter who had been trying to take a news photo.   The officer became

visibly angry and began speaking over Ruch. The officer then said, "There must

have been something that gave us probable cause. We can't un-arrest you,

because that makes liability." Ruch repeated that he had not committed any

crime.  Nevertheless, the officer later charged Ruch, based on an order from an

unidentified lieutenant with blocking a road that had already been shut down by APD because of the protest for the offense of disorderly conduct. The officer stated: "It's a bullshit charge, but my lieutenant said we have to charge you. If it was up to me, I'd cut you loose."

76.

Ruch was held for several hours until his fellow reporters were able to bail him out of jail. At the request of the city solicitor, Ruch's charges were dismissed the next day. Ruch filed a federal lawsuit. (The Amended Complaint is Ruch's lawsuit is attached hereto as Exhibit D).

77.

A motion to dismiss was denied, but the district court granted summary judgment. The basis for the ruling there was undermined by the Eleventh Circuit's later decision in Toole below which affirmed the denial of summary judgment in that case.

32

Toole Lawsuit

78.

On the same day as the Ruch incident, Cory Toole stood on the sidewalk and used his iPhone camera to videotape the surrounding crowd and officers. As Toole stood on the sidewalk of a road closed by officers to vehicular traffic, and several officers gathered around Toole.

79.

One APD officer sought to interfere with Toole's filming activities and instructed Toole to get back onto the sidewalk, despite the fact that the officer knew Toole was in fact on the sidewalk when the officer gave the instruction. With his camera filming the crowd, Toole explained to the officer that he was already on the sidewalk.

80.

Other persons, who were not filming, were in the same position on the sidewalk as Toole, but were not arrested. Even persons on the road and not the sidewalk (but who were not filming) were not arrested. Toole was targeted solely because he was filming the events.

81.

The officer repeated the instruction despite Toole continued position on the
sidewalk and recording video footage of where he stood.  Toole continued to
videotape the crowd from the sidewalk. Toole felt his arms and back grabbed
quickly by these multiple officers.

82.

Toole explained and implored, as his camera phone continued to record,
"I'm on the sidewalk!"  Disrupting video footage on his iPhone, Toole was pulled
by the Defendant-officers through the crowd and then thrown violently into the
street and onto the ground by the officers surrounding him. Multiple officers kept
Toole face-down on the ground, attempting to hold his arms behind his back.
Toole was compliant and not resisting throughout the excessive force and arrest.

83.

From being thrown so violently onto the street, Toole's face was cut with a
deep gash along his forehead and another on his lower lip. One of his top front
teeth also chipped. His jacket was also torn and ripped in various places from the
officers' force when they threw him down on the ground.  At this time, Toole and

the officers were now all in the street, approximately ten feet from the sidewalk where Toole had originally been standing and filming before the incident began. Once on the ground, Toole's filming cut out and his iPhone was later confirmed damaged. Officers took his phone.

84.

Officers held Toole against the ground for several minutes, yelling at him. Toole continued to explain to the officers that there was no reason for him to be pinned down because he had been standing on the sidewalk and filming.

85.

Handcuffed and with his chest and face against the ground, Toole remained held down by two officers.  Toole asked to confirm he was under arrest and, if so, for what reason. The officers laughed at Toole  Toole waited approximately another hour on the prisoner transport bus while officers discussed how to handle him.  After waiting for approximately another hour, the prisoner transport car finally took the group of arrestees to Zone 5 police station where he remained for at least three hours.

86.

By early the next morning, Toole was charged with disorderly conduct.

Toole was released from the police station on November 26, 2014. The charges

were subsequently dismissed.  (The Amended Complaint in Toole is attached

hereto as Exhibit E).

87.

Toole filed a federal lawsuit.  The district court denied a motion for

summary judgment as to the individual defendants and as to the City of Atlanta:

> Because there is a factual dispute about whether the APD has a
> custom or policy of inadequately training its officers on citizens'
> First and Fourth Amendment rights, and about whether that custom
> or policy caused Toole's constitutional rights to be violated, the City
> is not entitled to summary judgment on Toole's § 1983 claims.

(The district court order is attached hereto as Exhibit F).

88.

The individual defendants appealed the summary judgment decision to

the Eleventh Circuit which affirmed.  (The Eleventh Circuit Order is attached

hereto as Exhibit G).  *Toole v. City of Atlanta,* 798 Fed. Appx. 381, 386 (11th Cir.

2019).

Calhoun Lawsuit

89.

In *Calhoun v. City of Atlanta*, No. 1:09-CV-3286-TCB (N.D.Ga. 2011), a large group of officers conducted a warrantless raid on a bar, detained all patrons, and (specifically for the issues herein) several patrons, while detained, were prohibited from continuing their filming with their cell phones.  The patrons were not ultimately charged with a crime.  (The Amended Complaint in the Calhoun case is attached herein as Exhibit H).

90.

In Calhoun, the City of Atlanta entered into a Consent Order whereby the City agreed to permanently revoke or amend all APD SOPs regarding warrantless searches, arrests, and investigatory detentions and frisks without reasonable articulable suspicion. As part of that order, the City agreed to "prohibit Atlanta police officers from interfering in any way with a citizen's right to make video, audio, or photographic recordings of police activity, as long as such recording does not physically interfere with the performance of an officer's

duty." (Consent Order Attached hereto as Exhibits I/J).  The *Calhoun* Order required that the City of Atlanta conduct mandatory, in-person trainings by non-APD trainers for all sworn APD employees. This included training about officers being prohibited from interfering with citizens' right to record police activity. The Order required that the City of Atlanta provide recurring training on this issue to every sworn APD officer every two years.

91.

Despite these orders, APD did not add the court-ordered language prohibiting officers from deleting or destroying recordings to its SOP and failed to conduct the first of the court-ordered training regarding the change in SOP until June 2015.  Well over two years later, in deliberate indifference to both consent orders and to the obvious need for the policy and training outlined, the City still had not complied with the straightforward obligations imposed upon it by the orders.

92.

In *Calhoun* as well, the City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing Court orders dealing specifically with not interfering with citizens' photographing or filming of police activities. (Contempt Order attached hereto as Exhibit K).

93.

In 2019, the City of Atlanta was denied summary judgment as to their policy and custom of arresting persons for filming in a 2016 case where Atlanta police officers again arrested a citizen for filming police activity during a protest. *Toole v. City of Atlanta*, No. 1:16-02909-CAP (N.D. Ga. 2016) (Summary Judgment Order attached hereto as Exhibit F). The Defendants interlocutory appeal was rejected by the Eleventh Circuit. *Toole v. City of Atlanta*, 798 Fed. Appx. 381 (11th Cir. 2019). That case ultimately settled in 2020.

Hassan Lawsuit

94.

In 2021, the City of Atlanta was again sued when a photo-journalist was arrested while filming police activity. *Hassan v. City of Atlanta,* No. 1:21-CV-04629-TWT (N.D. Ga. 2021) (Complaint Attached hereto as Exhibit L). Hassan is a published freelance photojournalist. He has worked as a photojournalist since age seventeen, having started his career shooting for outdoor sports publications. Hassan has worked professionally both domestically and internationally photographing races and other outdoor sports, as well as political and social-change events. The latter have included pro-democracy protests in Egypt during the 2010-2012 Arab Spring, and political protests in Atlanta, GA.

95.

On June 1, 2020, Hassan had been photographing a protest and demonstration events around the City for much of the day. He was carrying his photography equipment, which consisted of a camera and a hip belt containing camera lenses.

96.

When the march reached the CNN Center, Hassan parked his bike and

photographed the protestors and police officers present in front of the Center.  The

street was blocked off to all vehicular traffic.

97.

Hassan noted a male individual wearing black pants and a red shirt ran down

this side street.  This individual was pursued by APD officers and taken to the

ground.

98.

Hassan followed down the side street and began photographing this individual's

arrest from a safe distance without interfering with the arrest in any way.  There

was no vehicular traffic allowed on this side street at this time.  Hassan was not

given any directions or orders to disperse before or at the time of his arrest.

Seconds after Hassan began photographing the male individual's arrest, an APD

officer, blocked Hassan's camera view, thus preventing his ability to photograph

the arrest. Two officers then grabbed Hassan and made him lie face-down on the

ground. These officers handcuffed Hassan with plastic zip ties, behind his back.

99.

Hassan was told he was being arrested for violating the City's curfew order. Hassan told the officers that he was a journalist and was there to take photographs. Hassan was holding his camera and was still wearing his hip belt containing his camera lenses.

100.

In addition to Hassan's arrest for filming, another persone saw Hassan being arrested, began filming his arrest, and she too was arrested while filming.

101.

Hassan's criminal charges were eventually dismissed.  In the federal lawsuit filed regarding the incident, after a motion to dismiss was denied, including claims of municipal liability against the City of Atlanta, the City settled that case in April 2023.  (Order on Motion to Dismiss attached hereto as Exhibit M).

Other Evidence of Custom and
<u>Complete Lack of Monitoring</u>

102.

In December 2022, a citizen was arrested for filming under the hands-free driving law at the general area where Plaintiff was arrested.  Deputy Atlanta Police Department Chief Carven Tyus (the second in Command of APD), in a public meeting endorsed and ratified pre-textual arrests stating "We had an individual who was out attempting to film officers," Tyus said in the meeting. "We were able to get him with the hands-free law as he drove by filming our officers, so we were able to lock him up."

103.

The actions of the Atlanta Police Department in arresting filmers, including Plaintiff and others, at the location of the proposed Atlanta Police training center has been condemned by the Georgia Chapter of the Society of Professional Journalists.

43

104.

Beyond the lawsuits identified in the Complaint, the City of Atlanta also settled pre-filing at least one other matter involving a citizen detained (but not arrested) for filming before any lawsuit was filed.

105.

On information and belief, and as will be revealed in discovery, the outlined instances are only a snapshot of a larger police interference with lawful filming.  Many instances involve threats of arrest, and/or arrests without resulting lawsuits.

106.

The City of Atlanta's deliberate indifference to the need for conformance with policies through training and monitoring, made patently clear by the Consent Orders entered into and then violated for years, was a moving force for similar constitutional violations. Moreover, a custom was created of repeatedly interfering and often arresting citizens who are legally photographing or filming police activity.

107.

On information and belief, and as will be revealed in discovery, the City of Atlanta has never reprimanded or otherwise disciplined any Atlanta Police Officer for arresting a citizen or journalist for filming despite its own Atlanta Citizen Review Board having recommended discipline in at least threecases that came before it and despite at least six settlements of lawsuits concerning citizens and journalists filming in public places.

108.

The repeated pretextual arrests of citizens and journalists for filming police activity have created a custom demonstrated by settlements, contempt findings, lack of monitoring, and even recent statements of a high ranking Deputy Chief .

109.

The failure to monitor and discipline any officers in a decades-long custom and practice of pretextually arresting persons for filming, in cases where the City of Atlanta has repeatedly settled lawsuits filed on such issues, demonstrated deliberate indifference to the rights of persons to film police activity and a moving force in Plaintiff's unconstitutional arrest.

110.

The final policymakers, including the chief of police and city council, had

actual knowledge of the facts and resolution of each prior arrest or interference

with filming.  These policymakers took no action to prevent further arrests, other

than those actions mandated by Consent Orders outlined herein.


**COUNT I**
**42 U.S.C. § 1983: Interference with Reporting and Filming Prior to Detention in**
**Retaliation for Filming (First Amendment)**
**(As to All Defendants)**

111.

Paragraphs 1 through 110 are hereby re-alleged as if fully pled herein.


112.

Defendants interfered with Mr. Watchulonis filming and reporting

activities prior to his detention and impaired his ability to engage in permissible

reporting.

113.

Defendants' interference with filming prior to detention was an effort to

terminate Mr. Watchulonis' filming activities because Defendants wanted to limit transparency and because they were concerned that Mr. Watchulonis' might be a supporter of the viewpoint of protesters.

114.

The law was clearly established well before 2022 that an officer of the state cannot detain or prolong the detention of a person for their exercise of freedom of speech, and particularly the right to film.

115.

Mr. Watchulonis is entitled to nominal, presumed and actual damages for particularized loss of his free speech and press rights because he was unable to capture images as a result of that pre-detention interference with filming.

**COUNT II**
**42 U.S.C. § 1983: Violation of the First Amendment Right to Film through Seizure and Detention in Violation of and Retaliation for the Exercise of First Amendment Rights**
**(As to all Defendants)**

116.

Paragraphs 1 through 110 are hereby re-alleged as if fully pled herein.

47

117.

After their initial interference with Mr. Watchulonis' filming, Defendants subsequently deliberately initiated and carried out a physical detention/seizure of Plaintiff because he exercised his rights to free speech and press by filming and/or because they supposed he supported a viewpoint contrary to those supporting the police training center.

118.

Mr. Watchulonis was (1) detained for one hour and a half, (2) harassed, and (3) threatened with an arrest if he did not show the officer his footage and then delete his footage on the Defendant officers' command.

119.

Mr. Watchulonis had a constitutionally protected right to refuse to show officers his footage (under threat of arrest if he refused to do so).

120.

Mr. Watchulonis had a clear constitutionally protected right not to delete footage (under threat of arrest if he refused to do so).  All Defendant officers had subjective knowledge of this law through specific APD SOP 2011 and training

under that SOP.  Defendants were specifically trained regarding these rights, and

Atlanta Police Department SOP's related thereto, as the result of federal court

orders in prior cases regarding the right to film.

121.

The law was clearly established well before 2022 that an officer of the state

cannot detain or prolong the detention of a person for their exercise of freedom

of speech, and particularly the right to film.

122.

Defendants' actions punished the Plaintiff for his exercise of his First

Amendment rights and to prevented him from further exercising his First

Amendment rights by abruptly cutting off his filming and threatening him that

their "paths will cross again."

123.

Plaintiff Watchulonis would not have been detained for one hour and a

half, harassed and intimidated but for (and in retaliation for) his exercise of his

First amendment rights and/or because Defendants supposed he supported a

viewpoint contrary to those supporting the police training center.

49

124.

Mr. Watchulonis alleges that he was detained for one and a half hours when otherwise similarly situated individuals not engaged in the same sort of protected speech or expression had not been so detained.  Citizens routinely and historically have parked, hiked and rode bicycles in the area where Plaintiff was passing through, and officers have not subjected such persons to detention or arrest.

125.

Mr. Watchulonis alleges that no person has been detained for one hour and a half, harassed, and threatened with an arrest on an alleged basis of a suspicion of criminal trespass when they were not engaged in the type of protected speech Mr. Watchulonis was engaged in at this location.

126.

Defendants' actions caused Mr. Watchulonis emotional distress, loss of liberty, and interfered with his reporting activities and freedom of movement.

127.

Mr. Watchulonis seeks nominal, actual, presumed and punitive damages

for the interference with his right to film resulting from the point of detention onward.

### COUNT III
### 42 U.S.C. § 1983: Unlawful Seizure in violation of the Fourth Amendment
### (As to All Defendants)

128.

Paragraphs 1 through 110 are hereby re-alleged as if fully pled herein.

129.

Prior to his detention, Defendants Officers Cantin, Thomas, and Bentley interfered with Mr. Watchulonis, right to film and interfered with his recording and reporting, and ultimately Officer Cantin forced Mr. Watchulonis to cease filming.

130.

When Defendants Cantin and Mike Doe fully detained/seized Mr. Watchulonis for one hour and a half, they harassed, intimidated and threatened him with an arrest because he was exercising his First Amendment right to film, because he refused to show or delete images and because the officers supported a viewpoint in favor of the police training facility construction at the location.

51

131.

The law was clearly established well before 2022 that an individual has a
First Amendment protected right to film the police and to be free from police
interference with this right.

132.

The law was clearly established well before 2022 that an officer of the state
cannot detain or prolong the detention of a person for their exercise of a First
Amendment right to film.

133.

The conduct of Defendants in causing and procuring the detention of
Plaintiff without arguable probable cause constituted an unreasonable seizure of
his person in violation of the Fourth Amendment.

134.

Mr. Watchulonis parked in a longstanding public parking lot, walked a
well-used public trail, and there was no signage to the contrary.  Moreover, the
first few minutes of conversation with Mr. Watchulonis dispelled any doubt as to
Mr. Watchulonis' intent and knowledge of the alleged trespass. Having the

knowledge that the area where Mr. Watchulonis entered and walked was not marked in any way as being off limits, having the knowledge that in fact Mr. Watchulonis followed the trails that were connected to a public parking lot, and hearing Mr. Watchulonis' explanation as to how he entered the area all defendants knew that Mr. Watchulonis could not have trespassed "knowingly" and therefore could not have committed the offense of criminal trespass.

135.

None of the Defendants ultimately issued any criminal trespass citation.

136.

Even assuming arguendo that Mr. Watchulonis was legally detained on suspicion of criminal trespass – the detention was "unreasonable" under the Fourth Amendment.  The circumstances, duration and manner of the detention was clearly unreasonable and violated Mr. Watchulonis' Fourth Amendment rights including demands that Mr. Watchulonis show the officers his images and delete those images they ordered deleted upon threat of arrest.

137.

The law was clearly established well before 2022 that an officer of the state

cannot cause someone to be detained without arguable probable cause and the facts alleged here do not support even arguable probable cause.

138.

The law was clearly established well before 2022 that an officer of the state cannot unreasonably prolong one's detention, and the facts alleged here show that the justifications for prolonging detention were clearly unconstitutional ones – to interfere with the right to film, to force Mr. Watchulonis to show the officers his constitutionally protected reportage/footage and to force him to delete footage under threat of arrest.

139.

Mr. Watchulonis seeks nominal, actual, presumed and punitive damages for his unreasonable detention. The actual damages include but are not limited to Mr. Watchulonis' loss of a contract offer with a television network worth over 72 thousand dollars that was abruptly withdrawn as a direct result of the network becoming aware of the publicity surrounding the detention subject to this lawsuit.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands the following:

a) That this action be tried by a jury;

b) That judgment be entered in favor of Plaintiff and against each individual Defendant for nominal, actual, presumed, special, compensatory and punitive damages (and nominal, presumed and actual damages as to the City of Atlanta) for each violation of the Plaintiff's constitutional rights in an amount to be determined by the enlightened conscience of fair and impartial jurors;

c) That an injunction issue to prevent future arrests or interference with filming of Plaintiff while filming in public places and not involved in any criminal conduct;

c) That Plaintiff be awarded attorney's fees and reasonable expenses of litigation;

e) That all costs of this action be taxed against Defendants; and

f) That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

55

Respectfully submitted this 4th day of August 2023.

/s/ Gerald Weber
Georgia Bar No. 744878

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, GA 31107
(404) 522-0507
wgerryweber@gmail.com

/s/Drago Cepar, Jr.
Drago Cepar, Jr.
Georgia Bar No. 142362

1900 The Exchange, Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dragoceparlaw@gmail.com