**IN IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Michael Watchulonis,

        Plaintiff,

v.                              Case No. 1:23-cv-2204-MLB

Officer Jeff Cantin, et al.,

        Defendants.

_____/

## <u>ORDER</u>

This First and Fourth Amendment case stems from Plaintiff Michael Watchulonis's effort to film the so-called "Cop City" protests on (allegedly unbeknownst to him) private property. (Dkt. 29.) Defendants Michael Carter, Jack Bentley, and Jeff Cantin—law enforcement officers who confronted Plaintiff that day—move for summary judgment, saying Plaintiff's claims fail as a matter of law and qualified immunity protects them. (Dkts. 111, 122, 126.)

Having reviewed the pleadings, the briefing, and the Local Rule 56.1 statements, the Court concludes the parties' imprecision has hampered its ability to decide the motions. The parties gloss over many

fundamental distinctions, equivocate, and ultimately talk past each other.  To be sure, consider the briefing on Count 3, the Fourth Amendment claim.  Defendants bounce back and forth (even in the same brief) between saying they "detained" or "arrested" Plaintiff.  (*See, e.g.*, Dkts. 111-2 at 15 (Agent Carter interviewed Plaintiff because "[Plaintiff had been detained[.]"); 122 at 2 ("Sergeant Bentley informed Plaintiff that he could record while he was being detained."), 3 ("Prior to his arrest, Plaintiff knew he was on disputed land."); 126-1 at 1 ("This case arises from the detainment and questioning of Plaintiff[.]").)[1]  Just a few pages later, however, they say qualified immunity protects them because they at least had "arguable probable cause," suggesting they (somehow) all

---

[1] To their credit, Defendants Bentley and Cantin try (but fail) to approach the issue with specificity.  Defendant Bentley says he "detained," not arrested, Plaintiff yet says nothing meaningful about the reasonable suspicion standard.  (*See* Dkt. 122 at 6 n.31, 10.)  Defendant Cantin (despite telling Plaintiff he **was under arrest**) also insists he detained, not arrested, Plaintiff since he reasonably suspected that Plaintiff criminally trespassed onto the land.  (Dkt. 126-1 at 19–20.)  Rather than commit to this position, however, he retreats from it several pages later and says he had actual or arguable *probable cause* to "detain" Plaintiff.  (*Id.* at 23.)  And in response to both, Plaintiff wallows in the mess and says factual disputes about whether they had "arguable probable cause to seize, detain, and arrest" him prevent summary judgment.  (Dkts. 140 at 9–22; 141 at 8–21.)

*arrested* Plaintiff even though each met Plaintiff at different points in the timeline. (*See* Dkts. 111-2 at 11–15; 122 at 6–10; 126-1 at 20–23.) Plaintiff's briefs do no better. He remains noncommittal about whether Defendants arrested or detained Plaintiff, arguing only they lacked "arguable probable cause"—the standard for an arrest, not an investigatory detention. (Dkts. 140 at 9 ("Plaintiff submits that there are jury questions as to whether [Defendant Bentley had] arguable probable cause to seize, detain, and arrest[.]"); 141 at 8 ("As to Defendant Cantin, Plaintiff submits that there are jury questions as to whether there was arguable probable cause to seize, detain, and arrest[.]"); 142 at 23 ("Even if there was arguable probable cause, [Plaintiff] has claims under the First Amendment for retaliatory arrest[.]").) But (as discussed below) these distinctions matter.

Given the concerns discussed in this Order, the Court **STRIKES** the summary judgment motions (Dkts. 111, 122, 126) and briefing. To get things back on track, the Court **SETS** an in-person hearing for April 20, 2026, at 10:00 a.m., in Courtroom 1906, Richard B. Russell Federal Building, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303. The parties should come prepared to discuss **each** issue mentioned in this Order.

After the parties flesh out those issues, the Court will set another briefing schedule. **All counsel of record must attend**.

Starting with Counts 1 and 2—the First Amendment claims. The parties' briefing on these claims is inconsistent, incomplete, and at times incoherent. Their confusion no doubt stems from the imprecision of the complaint.[2] Counts 1 and 2 lump together several distinct theories of First Amendment liability—along with what appears to be a Fourth Amendment claim for the alleged seizure of Plaintiff's camera—under two misleading headings. (*See* Dkt. 29 ¶¶ 111–27.) Count 1 seems to be both a First Amendment "interference" claim and a First Amendment retaliation claim wrapped into one. (*Compare id.* ¶¶ 114 ("The law was clearly established well before 2022 that an officer of the state cannot detain or prolong the detention of a person for their exercise of freedom of speech[.]"), *with* 115 ("Mr. Watchulonis is entitled to . . . damages for particularized loss of his free speech and press rights because he was

---

[2] Of course, precision in pleading matters even at summary judgment because (among other reasons) the complaint confines what theories or claims a party may assert. *Cf. Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (Even under the Rule 8's liberal pleading standard, parties cannot "raise new claims at [] summary judgment.").

unable to capture images as a result of pre-detention interference with filming.").) Count 2 is even more disjointed. It asserts First Amendment retaliation based on two forms of retaliatory conduct and, on top of that, injects allegations that Defendants conducted an unconstitutional search and seizure of his camera—allegations sounding in the Fourth Amendment. (*See id.* ¶¶ 117 ("Defendants subsequently deliberately initiated and carried out a physical detention/seizure of Plaintiff because he exercised his rights of free speech[.]"), 122 ("Defendants' actions punished the Plaintiff for his exercise of First Amendment rights . . . by abruptly cutting off his filming[.]"), 119 ("[Plaintiff] had a constitutionally protected right to refuse to show officers his footage[.]").)

The Court counts three theories of First Amendment retaliation, one amorphous First Amendment "interference" claim, and perhaps another Fourth Amendment search/seizure claim (in addition to the one already pled in Count 3). What's more, in his summary judgment briefing, Plaintiff introduces yet another theory of First Amendment liability, one he did not plead in the complaint at all: prior restraint. (*See* Dkts. 141 at 28; 142 at 15.) In the light of the scattershot complaint and briefing before it, the Court—and, as clear from their briefing, the

5

parties—has struggled to determine which First Amendment rubric(s) to apply to these claims. In other words, the nature of Plaintiff's First Amendment claims is so unclear in their current form that the Court cannot meaningfully evaluate them. To that end, Plaintiff must come prepared with a short and plain statement fully explaining the exact nature of his First Amendment claims in Counts One and Two. One claim (or theory) per count. **Six sentences or less per count**. No group pleading of what "Defendants" did, as plagues the amended complaint and briefing. Each Defendant has a right to understand the factual allegations upon which Plaintiff seeks to hold him liable. The imprecision of Plaintiff's claims should have been addressed at the pleading stage, and the Court will not allow the claim to proceed to summary judgment until the parties (and the Court) have a mutual understanding of the claims alleged. This is a primary purpose of the hearing—reaching a mutual understanding of what Plaintiff alleges in each count so the parties can prepare properly for summary judgment.

Turning to Count 3—the Fourth Amendment claim. (Dkt. 29 ¶¶ 128–39.) Plaintiff claims Defendants violated the Fourth Amendment by generally detaining him without arguable probable cause. (*E.g., id.*

¶ 133.)  But the clarity largely stops there.  Plaintiff uses the word "detain" interchangeably with the words "seizure" and "arrest."  (*See id.* ¶¶ 129 ("Prior to his *detention*, Defendants Officers Cantin, Thomas, and Bentley interfered with [Plaintiff's][] right to film[.]" (emphasis added)), 130 (alleging "Defendants Cantin and Carter *fully* detained/seized [Plaintiff]," whatever that means (emphasis added)), 137 ("The law was clearly established well before 2022 that an officer of the state cannot cause someone to be detained without arguable probable cause[.]").)  But a lawful brief detention (a so-called "*Terry* stop" or "investigatory stop") calls for a less stringent standard than a lawful arrest.  *See Navarette v. California*, 572 U.S. 393, 397 (2014) ("[T]he level of suspicion the [reasonable suspicion] standard requires is . . . obviously less than is necessary for probable cause.").  And the distinction certainly matters for qualified immunity purposes.  If, as Plaintiff suggests, some officers simply briefly "detained" Plaintiff to investigate a possible crime while others arrested him, a different standard for qualified immunity may apply to each officer's conduct.  *Compare Meshal v. Comm'r, Ga. Dep't of Pub. Safety*, 117 F.4th 1273, 1287 (11th Cir. 2024) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion

7

existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop. If the officers had arguable reasonable suspicion, then their violation of the law was not clearly established." (in-text citation omitted)), *with Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) ("[T]o establish the defense of qualified immunity for a false arrest claim, we have held that an officer need not have actual probable cause, but only arguable probable cause.").[3] No one pays any attention to this distinction. What's more, Count 3 goes on to allege Defendants Cantin and Carter "threatened him with an arrest" (implying Defendants hadn't already arrested him) and violated the Fourth Amendment by "prolong[ing] his detention." (Dkt. 29 ¶¶ 130, 132, 136.) These allegations suggest his claim also involves an investigatory detention that Defendants unlawfully extended. But again, the parties don't adequately discuss this discrepancy either. And the Court won't cavalierly overlook these nuances when applying such an important doctrine. *See White v. Pauly*, 580 U.S. 73, 79 (2017) (emphasizing "qualified immunity is important to society as a whole"). In the light of

---

[3] And the Court believes, but does not currently decide, these standards could prove **dispositive** for qualified immunity purposes.

8

these ambiguities, Plaintiff must come prepared to provide the same type of short and plain statement as to each Defendant's alleged liability for the Fourth Amendment violation: one claim (or theory) per Defendant for the count; **six sentences or less**; a plain statement of the exact claim alleged in each count and the factual basis for each Defendant's liability; addressing each Defendant's alleged basis for liability without resort to group pleading.

Next, the request for injunctive relief. Plaintiff seeks an injunction "prevent[ing] future arrests or interference with filming of Plaintiff [sic] while filming in public places and not involved in criminal conduct." (Dkt. 29 at 55 (Prayer for Relief).) While no one seems to move for summary judgment on this relief (as Plaintiff points out, Dkt. 142 at 25), the Court questions whether he has Article III standing to assert it in the first place. Setting aside whether he asks for a forbidden "obey the law" injunction, *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006), Plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury from" the police. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (no standing to assert section 1983 injunctive relief preventing chokeholds by officers because the

9

possibility the plaintiff would be stopped again and mistreated was too remote and speculative); *JW ex rel. Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) ("Past wrongs serve as evidence of whether there is a real and immediate threat of future injury, but past exposure to illegal conduct does not demonstrate a present case or controversy if unaccompanied by any continuing, present adverse effects.").  As in *Lyons*, the Court doubts the likelihood of future injury here is anything but speculative.

Finally, the parties' Local Rule 56.1 statements.  Defendants' statements of undisputed material fact are often disjointed and riddled with irrelevancies.  (*See* Dkts. 137, 138, 139.)  They also violate Rule 56.1 in several ways.  Sometimes, for example, the filings violate Rule 56.1(B)(1) by citing several facts in one dense numbered fact, couching legal conclusions as "facts," or including completely immaterial information as a fact.  (*See, e.g.*, Dkt. 139 ¶¶ 4, 8–9, 14–15, 21, 23 ("When asked by interrogatory to identify the conduct that is the basis for his claims, [Plaintiff] did not provide responsive information and instead referred to his complaint.").)  Other times, for instance, the filings violate Rule 56.1(B)(1) by citing (seemingly material) evidence in briefs not

found in their Rule 56.1 statements.  (*See, e.g.*, Dkts. 111-2 at 5 n.3; 126-1 at 4.)

Plaintiff's responses muddy the waters further.  Take just one fact cited in Defendant Cantin's Rule 56.1 statement.  He asserts Plaintiff "had not obtained permission or a press pass to be on the property." (Dkt. 138 ¶ 10.)  This seems indisputable: he either had it or he didn't. But Plaintiff counters with a borderline unintelligible argument about Defendant not defining "property" and the relevancy of the fact.[4]  How

---

[4] The objection reads:

> Plaintiff objects to this asserted fact pursuant to LR 56.1(b)(2)(a)(2)(ii)-(iii), NDGa, on the grounds and to the extent that it is vague and misleading in that "property" is not defined; and irrelevant and immaterial because Defendants did not produce or identify any policy prohibiting the filming at or requiring permits for filming at any of the properties where Mr. Watchulonis traveled and filmed around Intrenchment Creek Park, including the City of Atlanta Powercut where he was arrested, and Defendants could only point to one instance where media sought permission (which was a request to enter the construction site of the Training Center itself where Watchulonis never traveled) (Cantin Dep. 125:1-10, 126:9-12; Watchulonis Decl. ¶ 6). Additionally, at the time of incident, with the exception of the single "no trespassing" sign at the Key Road gate far from where Mr. Watchulonis traveled, there was no limits on entry to the area. (Carter Dep. 58:2-59:10, Ex. 6 (red marking on exhibit to indicate fencing); Video GoPro Watcher 8:16, 8:41, 9:00

11

does any of this dispute that simple fact?  The Court cannot tell.  This is a totally meaningless objection meant—it appears to the Court—to obfuscate and confuse.  Maybe whether Plaintiff had permission or a press pass matters to the outcome of the claims asserted.  Or maybe it doesn't.  But the legal implication should be discussed in briefs—not in the response to the Rule 56.1 statement of undisputed facts.

As another example, Defendant Bentley alleges "he was alerted over the radio by other APD Officers that a man was found trespassing on the Public Safety Training Center property." (Dkt. 137 ¶ 2.)  A very simple assertion.  Plaintiff, however, responds with an acknowledgment that Defendant Bently offered that testimony but then adds a lengthy discussion that Plaintiff was not trespassing because he was given no notice that he had strayed from public land, there weren't any "no trespassing" signs to warn him, no fences divided public and private land, and he was never told to leave the area.[5]  Would any reasonable person

> (video showing when fences and sign shown well after vehicle transports Watchulonis Northward from his path of travel).

(Dkt. 138 ¶ 10.)  Utter nonsense!

[5] His entire response was:

interested in a thoughtful determination of summary judgment take Defendant Bentley's assertion as to what he was told to include an assertion as to whether Plaintiff knowingly entered private land? Of course not—making this response nonsense.   Again, whether the information Defendant Bentley obtained matters to the outcome of any legal issue should be discussed in the briefing—not in a response to a Rule 56.1 statement.   Plaintiff repeatedly raises the alleged lack of signage, fencing, or any warning throughout his response to Defendant

---

Admitted that Defendant Bentley so testified, but disputed that Mr. Watchulonis was trespassing because he was never given notice that he was not on public land—there were no "no trespassing" signs anywhere along the Powercut (Deposition of Jeffrey Cantin (Doc. 126-2) ("Cantin Dep.") 109:12-16; Ex. 3 to the Deposition of Michael Watchulonis (Doc. 126-1), filed manually as Ex. F to Def. Cantin's Motion for Summary Judgment (Docs. 126, 128) (hereinafter referred to as "Video GoPro Watcher"),3 2:32-2:47, 9:55-9:57); there were no fences along the Powercut or in the interior boundary between the public and non-public side of Intrenchment Creek Park (*id.*; Deposition of Michael Carter (Doc. 111-8) ("Carter Dep.") 58:2-59:10, Ex. 6; Video GoPro Watcher Video 8:16, 8:41, 9:00 (showing fences only well after Atlanta police transported Mr. Watchulonis north from his path of travel); and he was never given a warning or told to depart (Cantin Dep. 105:17-25).

(Dkt. 137 ¶ 2.)  Again, utter nonsense!

13

Bentley's and the other Defendants' motions for summary judgment. (Dkts. 140 at 3, 6, 12, 15, 17; 141 at 3, 6, 11, 14, 16; 142 at 3, 6, 21, 22.) Does Plaintiff think it must rotely repeat this issue even when nonresponsive to an asserted fact lest the Court fail to follow his legal argument? The only proper response to this assertion by a reasonable litigant was: "Undisputed."

The Rule 56.1 statements have limited the Court's ability to decide which facts are undisputed. The Court will not allow this to continue. The Court will religiously apply Local Rule 56.1. The Court warns the parties that failure to strictly adhere to Local Rule 56.1 might result in their asserted facts being rejected and ignored or their responses being deemed improper and the Court accepting the fact asserted. If the parties don't understand that rule, they better learn it.

The parties must pay careful attention to the issues discussed in this Order and come prepared to chart a path forward.

**SO ORDERED** this 25th day of March, 2026.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

14